UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**　　'O'

| Case No. | 2:17-cr-00064-CAS - 2 | Date | August 12, 2025 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | (SPANISH) - Not Present | | |

| Catherine Jeang | Not Present | JohnPaul LeCedre, Not Present / Blake Hannah, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendants: | Present | Cust. | Bond | Attys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 2) RAYMUNDO LUGO-MARTINEZ | NOT | | X | 2) ANNIE CARNEY / ERIN MURPHY | NOT / NOT | X / X | |

**Proceedings:** (IN CHAMBERS) – MOTION TO SUPPRESS LUGO-MARTINEZ'S POST-ARREST STATEMENT [248] (Filed July 21, 2025)

## I.  INTRODUCTION

On February 3, 2017, the government filed a three-count indictment against defendants Esmeralda Gomez ("Gomez"), Raymundo Lugo-Martinez ("Lugo-Martinez"), Javier Hernandez ("Hernandez"), and Henry Quijada ("Quijada") (collectively, "defendants"). Dkt. 1. The indictment charges defendants with (1) conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii); and (3) sought criminal forfeiture, pursuant to 18 U.S.C. § 982(a)(1)(A). Id.

On December 8, 2021, Hernandez entered a plea of guilty to the first two counts of the indictment. Dkt. 99. Gomez has not made an appearance in this case.

On July 21, 2025, Lugo-Martinez filed the instant motion to suppress his post-arrest statements. Dkt. 246 ("Mot."). On July 25, 2025, the government opposed the motion. Dkt. 269 ("Opp."). On July 30, 2025, Lugo-Martinez filed his reply. Dkt. 293 ("Reply").

On August 12, 2025, the Court held a hearing. Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II.  BACKGROUND

The parties agree that on October 11, 2015, a confidential informant ("CI") working with the Drug Enforcement Agency drove an Audi sedan packed with methamphetamine from its pickup location in Fontana, California to Quijada's garage. Mot. at 1.; Opp. at 2. According to the government, at some point along the way, the CI met Lugo-Martinez and Hernandez at a gas station and the two led the CI to Quijada's residence. Opp. at 1. The government contends that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**              'O'

at the house, Lugo-Martinez took the keys from the CI, who waited in Quijada's home while Lugo-Martinez and Hernandez dismantled the Audi in the garage, leaving suddenly in search of a "'special tool.'"  Id.

After leaving for about an hour, Hernandez and Lugo-Martinez were seized by officers of the Fontana Police Department ("FPD") upon their return to Quijada's home.  Mot. at 1; Opp. at 2.  The government asserts that FPD officers had observed Lugo-Martinez and Hernandez as they drove to and entered O'Reilly's, Autozone, and Radio Shack.  Opp. at 2.

Officers contacted Quijada and the CI inside the garage and "eventually discovered a substantial quantity of pure methamphetamine within the center console of the vehicle, which had been visibly modified."  Id.  All defendants were then arrested and transported to the FPD for questioning.  Id.  Lugo-Martinez, according to Officer Mancha, the arresting FPD detective, was formally arrested at 8:30 p.m., and he was interrogated thereafter.  Mot. at 1.

Lugo-Martinez is a native Spanish-speaker, and because Officer Mancha does not speak Spanish, a jailer, "Jailer Gonzalez," provided translation.  Id., Opp. at 2.  Lugo-Martinez seeks to suppress the statements he made in the course of the interrogation due to what he argues was an invalid waiver of the rights guaranteed to him by Miranda v. Arizona, 384 U.S. 436 (1966).  Mot. at 1.  The Court excerpts the relevant portions of the interview below.

### III.   DISCUSSION

Lugo-Martinez argues that Miranda warnings were necessary because he was in custody when Officer Mancha interrogated him, as he had already been formally arrested.  Mot. at 2. Lugo-Martinez contends that the statements he made during the interrogation were not voluntary because he did not waive his Miranda rights with a full awareness of the nature of the rights he was abandoning and the consequences of doing so."  Id. at 3.  He argues that he did not give a lawful Miranda waiver and that his subsequent statements therefore must be suppressed because Jailer Gonzalez, who translated during the interrogation, did not give accurate Miranda warnings and Lugo-Martinez did not sign the waiver form until six minutes of interrogation had been completed.  Id. at 4.  Lugo-Martinez contends that Jailer Gonzalez's hurried "words did not ensure that Mr. Lugo-Martinez sufficiently understood the scope of his rights or the nature of the conversation," nor did the environment make him feel sufficiently comfortable to ask Jailer Gonzalez to slow down and provide clarification.  Id. at 5.  According to Lugo-Martinez, "[e]ven if read at a comprehensible rate, Jailer Gonzalez's warnings were, at best nonsensical and, at minimum, inaccurate."  Id.  For example, Lugo-Martinez argues, Jailer Gonzalez informed him that he had a "'right to talk to a lawyer before and during the translation …,'" rather than that he was going to be questioned and had a right to an attorney during that questioning.  Id. (citing Exh. B at 00:17).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CRIMINAL MINUTES – GENERAL   'O'

Lugo-Martinez argues that he communicated his lack of understanding immediately after Jailer Gonzalez provided the warnings because, though he answered "yes" to Jailer Gonzalez at the start, "his subsequent questions demonstrate a total lack of understanding." Id. at 5-6. Lugo-Martinez argues that "the earlier faulty Miranda warning snowballed into something even worse" because by informing him that he had the right to a lawyer during translation, rather than during questioning, Jailer Gonzalez "created the impression that Mr. Lugo-Martinez could expect to listen to her translation of Officer Mancha's words, not respond to his questions." Id. at 6 (emphasis omitted). After Lugo-Martinez informed Jailer Gonzalez that he intended to ask why he was there, he argues that she responded asking if that was why he wanted to talk and when he said yes, "making clear again that he was sitting there so Officer Mancha could explain why the police had suddenly handcuffed and detained him," she "then translated precisely the opposite sentiment to Officer Mancha," telling him Lugo-Martinez wanted to talk. Id. Lugo-Martinez argues that when Officer Mancha asked for clarification, Jailer Gonzalez then said that he wanted to know why he was there, at which point Officer Mancha and Jailer Gonzalez should have known that he did not know he was subject to questioning because "[n]one of the conversation up to that point would have led Mr. Lugo-Martinez, a Spanish speaker, to understand that he was sitting down because he agreed he would talk to the police and waive his right to have counsel present." Id. at 6-7.

Lugo-Martinez argues that his confusion arose at the beginning of the interrogation and persisted throughout, and that Officer Mancha and Jailer Gonzalez never explained to him that he was being asked for potentially incriminating information and that he had the right to an attorney during such questioning. Id. at 7. Lugo-Martinez contends that his questions made clear that he did not appear to understand his rights, and that even if he understood the nature of the interview, "he certainly could not have understood the rights and protections that were appliable to it." Id.

Finally, Lugo-Martinez argues that his signed Miranda waiver does not demonstrate a full awareness of the rights he was abandoning nor the consequences of doing so. Id. After a series of questions, Lugo-Martinez argues, he was told to sign a waiver and Jailer Gonzalez said, "'[s]ign the one on the top and *printear* your name,'"[1] telling him these were the rights he had been read. Id. (quoting Exh. B at 06:02). Lugo-Martinez argues that these rights were not really what Jailer Gonzalez had read to him earlier because the earlier warnings were flawed and there is no evidence demonstrating that he read the form or understood it when he signed. Id. at 8. In any case, Lugo-Martinez argues, even if he understood the written warnings when

---

[1] The translation indicates that "printear" is "Spanglish" and not an accurate translation of Officer Mancha's instruction to "[s]ign right here on the bottom and print your name." Dkt. 248-3 ("Transcript") at 8.

**CRIMINAL MINUTES – GENERAL**          **'O'**

he signed, they could not correct the failure to properly communicate the warnings before questioning began.  Id.

In opposition, the government first argues that Lugo-Martinez was advised of his rights and understood them, as Miranda warnings need not be given in a particular form, rather they must only reasonably convey the rights required by Miranda to the individual.  Opp. at 6.  The government argues that Lugo-Martinez was advised of all four relevant rights.  Id.  As to the right to remain silent, the government argues that Lugo-Martinez's argument that the speed at which it was communicated rendered it ineffective is "pure speculation contradicted by the fact that [Lugo-Martinez] was explicitly asked if he understood the right and said 'yes.'"  Id.  Second, the government argues that Lugo-Martinez was sufficiently advised that anything he said could be used against him in court and said yes in response to being asked whether he understood.  Id.  Third, the government argues that Lugo-Martinez was advised that he had "'the right to talk to a lawyer before and during the translation,'" and again responded that yes, he understood.  Id. at 7.  Fourth, the government argues that Lugo-Martinez was advised that if he could not pay a lawyer, one would be appointed if he wanted, and he responded yes to whether he understood.  Id.  The government argues that he was then asked whether he wanted to talk about what happened and that he began to tell the story of being lost.  Id.

The government argues that Lugo-Martinez is incorrect to contend that Jailer Gonzalez's third warning was not adequate because it gave the impression that he could listen to the translation without responding to questions.  Id.  According to the government, this argument asks the Court "to analyze the third advisement in a vacuum despite the Supreme Court and the Ninth Circuit both holding that the advisement should be analyzed in its totality."  Id.  When the warnings given by Jailer Gonzalez are taken together, the government argues, it is unreasonable to claim that Lugo-Martinez believed Officer Mancha would be the one making the statements.  Id. at 7-8.  The government contends that before questioning Jailer Gonzalez asked Lugo-Martinez whether he wanted to talk about what happened and he began talking about how he had been lost which "further demonstrates the unreasonableness of defense's assertion that [Lugo-Martinez] thought Officer Mancha would be providing the statements."  Id.

Next, the government argues that Lugo-Martinez knowingly and intelligently waived his rights.  Id.  The government contends that the test established by United States v. Crews, 502 F.3d 1130, 1140 (9th Cir. 2007) should lead the Court to determine that Lugo-Martinez was aware of the rights he was abandoning and the consequences of his decision to abandon them.  Id. at 8-9.  The government focuses on the second and sixth factors of the Crews test, arguing that the fact that Lugo-Martinez signed a waiver form and that his prior experience with the criminal justice system favor finding that he waived his rights knowingly and intelligently.  Id. at 9-10.  The government points to United States v. Glover, 596 F.2d 857, 864, 866 (9th Cir. 1979), where the Ninth Circuit found that someone had waived their Miranda rights because his

"extensive criminal history made him familiar" with the rights and the option to waive them, despite his "mental defects putting his intelligence in the bottom one percentile of society." Id. Here, the government contends, Lugo-Martinez has been read his Miranda rights before, in a case in which his waiver of Miranda rights was also a source of pre-trial litigation, demonstrating that the waiver in this case was knowing and voluntary.

In reply, Lugo-Martinez argues that given the government's acknowledgement that the test for a voluntary, knowing, and intelligent waiver is based on the totality of the circumstances, it is wrong to rely on Lugo-Martinez saying yes in response to being asked whether he understood each right to support the conclusion he truly did. Reply at 1-2. According to Lugo-Martinez, it is clear that he lacked the necessary awareness of the rights he was abandoning and the consequences of that decision because he immediately asked why he was there and demonstrated that he did not understand the basis for the warnings he received. Id. at 2. Lugo-Martinez argues that if he "did not understand that he was in a room to be asked incriminating questions, it follows that he did not understand that he had a right to be protected, through silence or the advice of counsel, from those incriminating questions." Id.

Further, Lugo-Martinez argues, the failure to translate the word interrogation in the third warning was critical to his lack of understanding, and while some minor deviations in Miranda warnings do not vitiate their efficacy, this error was beyond the permissible substitution of one synonym for another. Id. at 2-3. Lugo-Martinez argues that the use of "interrogation" was key because it would have informed him that he would be asked questions rather than be told why he was there. Id. at 2-3. Lugo-Martinez argues that the government cannot argue that he waived his rights related to an interrogation specifically because of the mistranslation and because Jailer Gonzalez could have clarified in the moment, but failed to do so. Id. at 3. It is possible, Lugo-Martinez contends, that he would have believed Officer Mancha would be giving him information, since it is not clear whether he was told whether he was under arrest prior to entering the interrogation room, nor can it be inferred that he understood the circumstances of the arrest or knew that there was methamphetamine in the car. Id. Accordingly, Lugo-Martinez argues, "[i]t is no surprise that [he] saw himself as a potential witness in conversation with the police, not as a suspect being interrogated." Id.

Lugo-Martinez next argues that though the government contends that his signature on the written Miranda form demonstrates that he knowingly and intelligently waived his rights, this does not dispose of the issue of voluntariness. Id. at 3-4. Indeed, Lugo-Martinez argues, there is no indication that he was given time to read the waiver and ensure his comprehension before he was rushed to sign it, given that Jailer Gonzalez explained the rights as identical to those she had described. Id. at 4. Lugo-Martinez contends that "a defendant's signature on the form is not *ipso facto* evidence of comprehension where, as here, the circumstances suggest otherwise." Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL           'O'**

Last, Lugo-Martinez argues that the government is incorrect to say that because he was arrested and interrogated five years before, he must have understood the Miranda warnings given to him here. Id. Lugo-Martinez argues that the government relies on a motion written by the U.S. Attorney's Office in his prior case arguing that he had knowingly and voluntarily waived his rights, which does not mean he actually had. Id. Instead, he argues, those warnings may have suffered from similar flaws, and it is impossible to determine, without more, whether he understood the warnings given then. Id. at 4-5. Finally, he argues that his questions in response to being asked if he wanted to discuss what happened showed "an utter lack of comprehension about the nature of the conversation with the police, let alone the rights intended to cabin it." Id. at 5.

The Court concludes that Lugo-Martinez's statements should be suppressed. The parties do not dispute that this was a custodial interrogation, and thus that Miranda warnings were necessary. It is well established that "[p]rior to any questioning, the person [in custody] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). In Miranda, the Supreme Court made clear that an individual could waive these rights, so long as "the waiver is made voluntarily, knowingly and intelligently." Id. To determine whether a Miranda waiver is so made, two aspects of the circumstances must be analyzed. First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. The Supreme Court went on to explain that only if the totality of the circumstances indicates both that the waiver was given without coercion and that it was done with "the requisite level of comprehension," may a court conclude that the rights guaranteed by Miranda were waived. Id.

The Ninth Circuit has established that courts should apply a presumption against waiver and that the government bears the burden of overcoming this presumption by a preponderance of the evidence. United States v. Crews, 502 F.3d 1130, 1139-1140 (9th Cir. 2007) (citing United States v. Garibay, 143 F.3d 534, 536 (9th Cir.1998)). In Crews, the Court set forth factors to be considered in determining whether, under the totality of the circumstances, a waiver was made with awareness of the rights being abandoned and the consequences of abandonment. Id. at 1140. The Ninth Circuit recommended analysis of the following six factors:

> (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights;

(v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

Id. (citing Garibay, 143 F.3d at 537-39).

The Court concludes that in this case, Lugo-Martinez cannot be said to have knowingly and intelligently waived his rights. The Court finds that as to the first prong of the Miranda analysis, no intimidation, coercion, or deception was involved, and neither party argues as to the voluntariness of the statement specifically. However, the Court's analysis of the second prong, whether waiver was made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," the Court concludes that the government has not shown, by a preponderance of the evidence, that this was the case for Lugo-Martinez. Moran, 475 U.S. at 421. The Court looks to each of the factors from Crews in making this determination.

First, there is no evidence presented that Lugo-Martinez suffered from any kind of diminished mental capacity. Second, though Lugo-Martinez ultimately signed a written waiver, he did so at the conclusion of the interrogation. Cases that have rested on the provision of written warnings or a signed waiver have done so on the basis that the defendant received such written warnings and was provided an opportunity to read and understand them prior to questioning. See, e.g., Berghuis v. Thompkins, 560 U.S. 370, 385-86 (2010); Maryland v. Schatzer, 559 U.S. 98, 101-102. It is clear that a written waiver provided after an interrogation is not a valid indicator of whether or not a defendant understood his rights when the interrogation began. See Missouri v. Seibert, 542 U.S. 600, 604 (2004) (holding that Miranda warnings provided after an unwarned confession do not cure the prior unwarned confession); United States v. Johnson, No. 19-cr-01327001-TUCR-MEJM, 2020 WL 525682, at *7 (D. Ariz. Feb. 3, 2020) (finding that a "post-interview signed waiver is not enough to overcome other evidence in the record that Defendant did not understand and knowingly waive his rights *before* the interview began"); United States v. Mir, 224 F. Supp. 3d 217, 219 (S.D.N.Y. 2016) (concluding that suppression was not warranted on the basis that written warnings were provided at the conclusion of the interrogation, when defendant was read his rights and stated that he understood them at the outset of the interview). Accordingly, though written waiver at the end of the interview may not counsel suppression of the statements, the question is whether the oral warnings provided to Lugo-Martinez before the interview did indeed advise him or his rights such that he was equipped to make a knowing and intelligent waiver.

Turning to the third factor, FPD attempted to provide warnings to Lugo-Martinez in his native tongue, Spanish, through Jailer Gonzalez who assisted in the interview. However,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL            'O'**

parties dispute whether Jailer Gonzalez's translation was effective in communicating Lugo-Martinez's rights to him. The following exchange occurred at the start of the interview:

> Jailer Gonzalez: You have the right to keep silent, understand?[2]
>
> Lugo-Martinez: Yes
>
> Jailer Gonzalez: Everything you say can be against – can be – can be used against you in the court, understand?
>
> Lugo-Martinez: Yes
>
> Jailer Gonzalez: You have the right to talk to a lawyer before and during the translation, understand?
>
> Lugo-Martinez: Yes
>
> Jailer Gonzalez: If you can't pay a lawyer, the lawyer will be appointed if you want, understand?
>
> Lugo-Martinez: Yes

Transcript at 1. Lugo-Martinez argues that the first warning was given too quickly to comprehend and that the third warning is specifically flawed due to mistranslation. The Court agrees that the mistranslation resulting in a warning that Lugo-Martinez had "the right to talk to a lawyer before and during the translation" may not have reasonably conveyed to Lugo-Martinez his rights as required by Miranda.

In United States v. Botello-Rosales, the Ninth Circuit concluded that an explanation of the right to a lawyer given as "'[i]f you don't have the money to pay for a lawyer, you have the right. One, who is free, could be given to you,'" was insufficient because the translator had used the word "libre" for free, meaning being at liberty to do something, rather than meaning without cost. 728 F.3d 865, 867-868 (9th Cir. 2013). Additionally, the Court held that the use of the word "could" rendered the warning ineffective because it made it the right sound contingent, rather than like an "absolute obligation." Id. The Ninth Circuit held that a similar mistranslation, that defendant had "the right to solicit the court for an attorney if you have no funds," also inadequately communicated the right. United States v. Perez-Lopez, 348 F.3d 839, 847 (9th Cir. 2003).

Though no talismanic incantation [is] required to satisfy its strictures," Miranda rights must be conveyed to a suspect in a manner that allows him to reasonably understand the rights

---

[2] Translation indicates "speaking very fast." Translation at 1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL         'O'**

afforded to him. California v. Prysock, 453 U.S. 355, 359 (1981). The Ninth Circuit precedent cited above indicates that a translation that does not clearly communicate the contours of the right renders a waiver invalid. The Court concludes that the use of "translation," instead of "questioning," "interrogation," or "interview," weighs against a finding that Lugo-Martinez's waiver was knowingly and intelligently made because it leaves room for confusion as to the scope of the right to the presence of counsel during any interrogation.

As to the Fourth Crews factor, whether defendant appeared to understand his rights, the interview transcript provides mixed evidence. Though Lugo-Martinez said "yes" when asked if he understood each right, the subsequent exchange indicates that he may not have. After Jailer Gonzalez translated Lugo-Martinez's rights, the following exchange took place:

> Jailer Gonzalez: Do you want to talk about what happened?
>
> Lugo-Martinez: N-no, every – we were – we were lost, I mean – do I want to talk about what happened? What? How?
>
> Jailer Gonzalez: About – ah – why you are here.
>
> Lugo-Martinez: Why am I here? That's my question.
>
> Jailer Gonzalez: Is that – that's why you want to talk?
>
> Lugo-Martinez: Eh – yes.
>
> Jailer Gonzalez [to Officer Mancha in English]: OK. He said he wants to talk.
>
> Officer Mancha: He wants to talk?
>
> Jailer Gonzalez: Aha, he wants to know why he is here.
>
> Officer Mancha: Alright … why was he at the Elaine address today?
>
> [Interview continues with Lugo-Martinez answering questions from Officer Mancha]

Transcript at 2-3. The Court agrees with Lugo-Martinez that this exchange evinces a lack of understanding of the situation and his rights.

As to the fifth Crews factor, whether Lugo-Martinez's rights were individually and repeatedly explained to him, it appears to the Court that the rights were read to him individually, though they were not repeated until he was handed the waiver to sign and told that what was written was "the rights we read you." Transcript at 8. However, because this repetition came after the interrogation, it does not factor into the Court's analysis. As to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL           'O'**

sixth factor, on which the government places great weight, it is clear that Lugo-Martinez had one prior conviction and was informed of his Miranda rights once before. Lugo-Martinez contends that the government's evidence pertaining to the sufficiency of the warnings he received in that case does not satisfy its burden, as provision of the motion *in limine* filed in that case to admit Lugo-Martinez's statement does not demonstrate that he was properly Mirandized. In the context of the Crews multifactorial test, however, the Court finds it is sufficient for the Court to determine that Lugo-Martinez has had past encounters with the criminal justice system. See, e.g., United States v. Meza, 800 F. App'x 463, 465 (9th Cir. 2020) (noting only that defendant had prior contact with the criminal justice system and conducting no further analysis of the sufficiency of that conduct for his knowledge of his Miranda rights); Orellana v. Madden, No. 16-cv-2316-FMO-FFM, 2019 WL 13426372, at *6 (C.D. Cal. Jan. 10, 2019) (same).

The Court concludes that the Crews factors weigh in favor of suppression of the statement. A knowing and intelligent waiver requires a defendant to understand his rights and the consequences of waiving them, and the translation issue here and subsequent confusion evinced by the interaction between Lugo-Martinez and Jailer Gonzalez lead the Court to conclude that that Lugo-Martinez's waiver was not knowing and intelligent, despite his mental acuity, individual explanation of his rights, and prior experience with the criminal justice system. The government bears the burden of showing that there was no basis for misunderstanding the Miranda warning, and here it has failed to meet this burden. Lugo-Martinez is a Spanish speaker and was told he had a "right to talk to a lawyer before and during the translation," which does not sufficiently approximate the proper admonition. Transcript at 2. Had the words interrogation, questioning, or interview been used, the outcome may have been different, but because the Court cannot speculate as to what Lugo-Martinez may have understood the warning given to mean, the Court turns to the record and concludes that Lugo-Martinez was not properly read his rights and therefore that he did not understand what rights he was waiving and the consequences of doing so. Accordingly, the Court finds that the government has not demonstrated, by a preponderance of the evidence, that Lugo-Martinez's waiver of his Miranda rights was knowingly and intelligently made.

## IV.  CONCLUSION

In accordance with the foregoing, the Court **GRANTS** Lugo-Martinez's motion to suppress his post-arrest statements.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | | CMJ |